1
2
3
4
5
6                       **UNITED STATES DISTRICT COURT**
7                            **DISTRICT OF NEVADA**
8   THOMAS LESTER FURY, JR.,            )        3:17-cv-00229-LRH-WGC
                                        )
9              Plaintiff,               )        **REPORT & RECOMMENDATION**
                                        )        **OF U.S. MAGISTRATE JUDGE**
10      vs.                             )
                                        )        Re:  ECF Nos. 15, 16
11  NANCY A. BERRYHILL,                 )
    Acting Commissioner of Social Security )
12  Administration,                     )
                                        )
13             Defendant.               )
    _____)
14

15          This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States

16  District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

17  636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4.

18          Before the court is Plaintiff's Motion to Reverse and Remand Administrative Decision to Allow

19  Award of Benefits. (ECF No. 15.) The Commissioner filed a Cross-Motion to Affirm and Response to

20  Plaintiff's Motion to Reverse and Remand. (ECF Nos. 16, 17.) Plaintiff filed a reply. (ECF No. 18.)

21          After a thorough review, the court recommends that Plaintiff's motion be granted, the

22  Commissioner's cross-motion be denied, and that this matter be remanded for further proceedings.

23                                **I. BACKGROUND**

24          On May 17, 2013, Plaintiff completed applications for disability insurance benefits (DIB) under

25  Title II of the Social Security Act and for supplemental security income (SSI) under Title XVI of the

26  Social Security Act, alleging disability beginning November 21, 2012, which is the date he was involved

27  in a motor vehicle accident which resulted in him being ejected from the vehicle and suffering various

28  injuries. (Administrative Record (AR) 213-222.) The applications were denied initially and on

    reconsideration. (AR 102-106, 110-114.)

1    Plaintiff requested a hearing before an administrative law judge (ALJ). (AR 116-117.) ALJ

2    Eileen Burlison held a hearing on June 15, 2015. (AR 36-66.) Plaintiff, who was represented by counsel,

3    appeared and testified on his own behalf at the hearing. Testimony was also taken from a vocational

4    expert (VE). On October 9, 2015, the ALJ issued a decision finding Plaintiff not disabled. (AR 17-29.)

5    Plaintiff requested review, and the Appeals Council denied the request, making the ALJ's decision the

6    final decision of the Commissioner. (AR 1-12.)

7    Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). Plaintiff

8    argues that the ALJ erred in evaluating the opinions of Plaintiff's treating neurosurgeon, Deven Khosla,

9    M.D., and that the ALJ improperly discredited Plaintiff's pain testimony.

10                              **II. STANDARD OF REVIEW**

11   **A. Substantial Evidence**

12    The court must affirm the ALJ's determination if it is based on proper legal standards and the

13   findings are supported by substantial evidence in the record. *Gutierrez v. Comm'r Soc. Sec. Admin.*, 740

14   F.3d 519, 522 (9th Cir. 2014) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere

15   scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept

16   as adequate to support a conclusion.'" *Gutierrez*, 740 F.3d at 523-24 (quoting *Hill v. Astrue*, 698 F.3d

17   1153, 1159 (9th Cir. 2012)).

18    To determine whether substantial evidence exists, the court must look at the record as a whole,

19   considering both evidence that supports and undermines the ALJ's decision. *Gutierrez*, 740 F.3d at 524

20   (citing *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001)). The court "'may not affirm simply by

21   isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir.

22   2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). "'The ALJ is responsible

23   for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities.'" *Id*.

24   (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)). "If the evidence can reasonably

25   support either affirming or reversing, 'the reviewing court may not substitute its judgment' for that of the

26   Commissioner." *Gutierrez*, 740 F.3d at 524 (quoting *Reddick v. Chater*, 157 F.3d 715, 720-21 (9th Cir.

27   1996)). That being said, "a decision supported by substantial evidence will still be set aside if the ALJ

28   did not apply proper legal standards." *Id*. (citing *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219,

1222 (9th Cir. 2009); *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003)). In addition, the court will "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely." *Garrison*, 759 F.3d at 1010 (citing *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003)).

**B. Five-Step Evaluation of Disability**

Under the Social Security Act, "disability" is the inability to engage "in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A claimant "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 1382c(a)(3)(b).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. 20 C.F.R. § 404.1520 and § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). In the first step, the Commissioner determines whether the claimant is engaged in "substantial gainful activity"; if so, a finding of nondisability is made and the claim is denied. 20 C.F.R. § 404.1520(a)(4)(i), (b); § 416.920(a)(4)(i); *Yuckert*, 482 U.S. at 140. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to step two.

The second step requires the Commissioner to determine whether the claimant's impairment or combination of impairments are "severe." 20 C.F.R. § 404.1520(a)(4)(ii), (c) and § 416.920(a)(4)(ii); *Yuckert*, 482 U.S. at 140-41. An impairment is severe if it significantly limits the claimant's physical or mental ability to do basic work activities. *Id*.

In the third step, the Commissioner looks at a number of specific impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listed Impairments) and determines whether the impairment meets or is the equivalent of one of the Listed Impairments. 20 C.F.R. § 404.1520(a)(4)(iii), (d) and § 416.920(a)(4)(iii), (c). The Commissioner presumes the Listed Impairments are severe enough to

preclude any gainful activity, regardless of age, education, or work experience. 20 C.F.R. § 404.1525(a). If the claimant's impairment meets or equals one of the Listed Impairments, and is of sufficient duration, the claimant is conclusively presumed disabled. 20 C.F.R. § 404.1520(a)(4)(iii), (d), § 416.920(d). If the claimant's impairment is severe, but does not meet or equal one of the Listed Impairments, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. § 404.1520(a)(4)(iv), (e), (f) and § 416.920(a)(4)(iv), (e), (f). Past relevant work is that which a claimant performed in the last fifteen years, which lasted long enough for him or her to learn to do it, and was substantial gainful activity. 20 C.F.R. § 404.1565(a) and § 416.920(b)(1).

In making this determination, the Commissioner assesses the claimant's residual functional capacity (RFC) and the physical and mental demands of the work previously performed. *See id.;* 20 C.F.R. § 404.1520(a)(4); *see also Berry v. Astrue*, 622 F.3d 1228, 1231 (9th Cir. 2010). RFC is what the claimant can still do despite his or her limitations. 20 C.F.R. § 1545 and § 416.945. In determining RFC, the Commissioner must assess all evidence, including the claimant's and others' descriptions of limitation, and medical reports, to determine what capacity the claimant has for work despite the impairments. 20 C.F.R. § 404.1545(a) and § 416.945(a)(3).

A claimant can return to previous work if he or she can perform the "actual functional demands and job duties of a particular past relevant job" or "[t]he functional demands and job duties of the [past] occupation as generally required by employers throughout the national economy." *Pinto v. Massanari*, 249 F.3d 840, 845 (9th Cir. 2001) (internal quotation marks and citation omitted).

If the claimant can still do past relevant work, then he or she is not disabled for purposes of the Act. 20 C.F.R. § 404.1520(f) and § 416.920(f); *see also Berry*, 62 F.3d at 131 ("Generally, a claimant who is physically and mentally capable of performing past relevant work is not disabled, whether or not he could actually obtain employment.").

If, however, the claimant cannot perform past relevant work, the burden shifts to the Commissioner to establish at step five that the claimant can perform work available in the national economy. 20 C.F.R. § 404.1520(e) and § 416.290(e); *see also Yuckert*, 482 U.S. at 141-42, 144. This means "work which exists in significant numbers either in the region where such individual lives or in

4

several regions of the country." *Gutierrez*, 740 F.3d at 528. If the claimant cannot do the work he or she did in the past, the Commissioner must consider the claimant's RFC, age, education, and past work experience to determine whether the claimant can do other work. *Yuckert*, 482 U.S. at 141-42. The Commissioner may meet this burden either through the testimony of a vocational expert or by reference to the Grids. *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999).

"The grids are matrices of the four factors identified by Congress—physical ability, age, education, and work experience—and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." *Lockwood v. Comm'r of Soc. Sec. Admin.*, 616 F.3d 1068, 1071 (9th Cir. 2010) (internal quotation marks and citation omitted). The Grids place jobs into categories by their physical-exertional requirements, and there are three separate tables, one for each category: sedentary work, light work, and medium work. 20 C.F.R. Part 404, Subpart P, Appx. 2, § 200.00. The Grids take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at the various functional levels. *Id*. Each grid has various combinations of factors relevant to a claimant's ability to find work, including the claimant's age, education and work experience. *Id*. For each combination of factors, the Grids direct a finding of disabled or not disabled based on the number of jobs in the national economy in that category. *Id*.

If at step five the Commissioner establishes that the claimant can do other work which exists in the national economy, then he or she is not disabled. 20 C.F.R. § 404.1566. Conversely, if the Commissioner determines the claimant unable to adjust to any other work, the claimant will be found disabled. 20 C.F.R. § 404.1520(g); *see also Lockwood*, 616 F.3d at 1071; *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).

## III. DISCUSSION

### A. ALJ's Findings in this Case

At step one, the ALJ found Plaintiff met the insured status requirements through June 30, 2016, and had not engaged in substantial gainful activity since the alleged onset date of November 21, 2012. (AR 19.)

At step two, the ALJ concluded Plaintiff had the following severe impairments: traumatic brain injury, nerve damage, broken neck, broken scapula, anxiety and hearing loss. (AR 19.)

At step three, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the Listed Impairments. (AR 20-22.)

At step four, the ALJ assessed Plaintiff as having the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b)[1], except he was limited as follows: he should avoid jobs that require repetitive climbing; he is limited to occasionally climbing stairs, ramps, ladders, and scaffolds, and in stooping, balancing, kneeling, crouching and crawling; he requires a reasonably clean environment free of pulmonary irritants; and should be limited to brief contact with supervisors, coworkers and the public. (AR 22.)

The ALJ then concluded Plaintiff was unable to perform any past relevant work. (AR 27-28.)

At step five, the ALJ determined, based on VE testimony, that considering Plaintiff's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform, including: Assembler (Dictionary of Occupational Titles (DOT) Number 712.687-010); Cleaner/Housekeeping (DOT Number 323.687-014); and Packing-Line Worker (DOT Number 73.687-038). (AR 28-29.) As a result, the ALJ found Plaintiff not disabled from November 21, 2012, through October 29, 2015 (the date of the decision). (AR 29.)

**B. Dr. Khosla's Opinion**

**1. Summary of Argument**

Plaintiff argues that the ALJ erred in rejecting Dr. Khosla's opinion. First, Plaintiff contends the ALJ mischaracterized Dr. Khosla as seeing Plaintiff once and giving opinions at counsel's behest when Dr. Khosla was his treating neurosurgeon. In fact, Plaintiff asserts that Dr. Khosla was Plaintiff's neurosurgeon from the time he arrived at the hospital following the accident, and continued to treat with him. Second, Plaintiff argues that the record does not support the ALJ's conclusion that Dr. Khosla's

---

[1]

    "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of find dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b); § 416.967(b). "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time." Social Security Ruling (SSR) 83-10.

1  diagnoses are contradicted or unsupported, so as to give the opinion less weight.

2        The Commissioner argues that the ALJ properly assigned little weight to Dr. Khosla's opinion,

3  and provided specific and valid reasons for so doing. Specifically, the Commissioner contends: that the

4  ALJ correctly noted that the opinion was inconsistent with the generally unremarkable diagnostic

5  findings; the ALJ noted that Plaintiff's pain was effectively managed by medication; the opinion was

6  inconsistent with other opinion evidence; the ALJ stated that Plaintiff's reported daily activities

7  contradicted Dr. Khosla's opinion; and, the ALJ permissibly discounted the opinion because it was

8  obtained at the request of counsel. The Commissioner also argues that the record shows that Dr. Khosla

9  only saw Plaintiff before and following the neck surgery to correct the neck injury, which was performed

10  in January 2013.

11        **2. Legal Standard**

12        "'In disability benefits cases … physicians may render medical, clinical opinions, or they may

13  render opinions on the ultimate issue of disability—the claimant's ability to perform work.'" *Garrison*

14  *v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.

15  1998)).  "Courts 'distinguish among the opinions of three types of physicians:

16        (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the

17  claimant (examining physician); and (3) those who neither examine nor treat the claimant (nonexamining

18  physicians).'" *Garrison*, 759 F.3d at 1012 (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

19  "'As a general rule, more weight should be given to the opinion of a treating source than to the opinion

20  of doctors who do not treat the claimant.'" *Id*. "[T]he opinion of a treating physician is thus entitled to

21  greater weight than that of an examining physician, [and] the opinion of an examining physician is

22  entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012 (citing

23  *Ryan*, 528 F.3d at 1198). "If a treating physician's opinion is well-supported by medically acceptable

24  clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence

25  in [the] case record, [it will be given] controlling weight." *Ghanim v. Colvin*, 763 F.3d 1154, 1160 (9th

26  Cir. 2014) (citation and quotation marks omitted); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th

27  Cir. 2017) (citing 20 C.F.R. § 404.1527(c)(2))). "Greater weight is also given to the 'opinion of a

28  specialist about medical issues related to his or her area of specialty.'" *Revels*, 874 F.3d at 654 (citing

20 C.F.R. § 404.1527(c)(5)). "'The weight afforded a non-examining physician's testimony depends on the degree to which [he or she] provide[s] supporting explanations for [his or her] opinions." *Garrison*, 759 F.3d at 1012.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Garrison*, 759 F.3d at 1012. "[E]ven when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight … even if it does not meet the test for controlling weight.'" *Garrison*, 759 F.3d at 1012 (quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)). "An ALJ can satisfy the 'substantial evidence' requirement by 'setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Garrison*, 759 F.3d at 1012 (quoting *Reddick*, 157 F.3d at 725). "'The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct.'" *Id.* (citation omitted).

If an ALJ decides not to give a treating physician's opinion controlling weight, the ALJ must apply the factors set out in 20 C.F.R. § 404.1527(c) and 20 C.F.R. § 416.927(c) in determining how much weight to give each opinion. *See Revels*, 874 F.3d at 654. The factors include: length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, specialization, and other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c), § 416.927(c). The failure to consider these factors constitutes reversible legal error. *Trevizo v. Berryhill*, 871 F.3d 664, 676 (9th Cir. 2017).

**3. Analysis**

**a. Summary of Plaintiff's Medical Records (Physical)**

As mentioned above, Plaintiff was involved in a motor vehicle accident where he was ejected from his vehicle on November 21, 2012. (*See* AR 412.) He was sent to Pershing General Hospital via ambulance, and then transferred to Renown Regional Medical Center. (AR 364, 408-412.) He was

evaluated by radiology, which revealed fractures of the ribs, scapula, and thoracic spine. (AR 365-71.) Plaintiff was under the care of neurologist Dr. Martin Bain, and consulting physicians Dr. Khosla (neurosurgery), Dr. Jackson Jones (orthopedics), and Dr. Haydon Hill (physiatry). (AR 375, 377-387.) Dr. Khosla consulted on multiple spinal fractures, which were initially managed non-operatively. (AR 377.) On discharge, Plaintiff was instructed to follow up with Dr. Khosla in two weeks, with Dr. Khosla's notes stating that an MRI of the cervical spine might be required to determine disc pathology, and whether the C6 fracture needed stabilization. (AR 386-87.)

Plaintiff's underwent a head CT on November 25, 2012, which was normal. (AR 340-41.) Plaintiff saw Dr. Bain on November 27, 2012. Plaintiff had tenderness in the thoracolumbar region, and marked restriction of motion in the left shoulder. (AR 384.) He was assessed with a mild traumatic brain injury/concussion with recent agitation and delirium that were improving; a left scapular fracture; diffuse spinous fractures at T5 through T10; a left-sided transverse process fracture and nondisplaced compression fracture at T12; and, an anterior spinal ligament injury at C6-7 with an articular process fracture at C6. (AR 384.) Plaintiff claimed he was unsteady at times in getting up and about, and this was corroborated by the nurse. (AR 384-85.)

Plaintiff was seen by Dr. William Everts on December 6, 2012, for pain treatment following the accident. (AR 442.) He was in a neck collar and reported pain in his neck and down his back. (AR 442.) He had weakness in the left upper extremity secondary to pain. (AR 442.) He was prescribed various medications including oxycodone, lisinopril, and gabapentin. (AR 442.)

He saw Dr. Douglas Vacek on January 2, 2013. (AR 440-41.) He reported ongoing dizziness after the accident, as well as pain. (AR 440.) He was ambulating with a cane, and it was noted that he had some dramatic displays of vertigo where he would fall over. (AR 441.) He had cervical spine and left-shoulder tenderness. (AR 440.) He was given an oxycontin refill, and signed a pain contract. (AR 440.) He was counseled on the need to scale down the oxycodone, decrease ibuprofen, and decrease the gabapentin to see if it was contributing to his dizziness. (AR 441.)

January 8, 2013 x-rays of the cervical spine revealed minimal anterior subluxation of C6 at C7 of uncertain significance, with a note that further evaluation with a CT was to be considered given the history of trauma. (AR 362.)

Plaintiff saw Dr. Khosla on January 10, 2013. (AR 321-323.) At that time, long and short term memory loss were reported, as well as double vision, neck pain, pain into the thoracic spine with numbness, pain in the scapular fracture area, pain into the biceps bilaterally, and an unsteady gait requiring the use of a cane. (AR 321.) Dr. Khosla reviewed the new spine x-rays which revealed spondylolisthesis at C6-7, which was not present in the previous imaging. (AR 323.) Dr. Khosla advised Plaintiff that the memory loss and dizziness were likely from a mild head injury, and some damage to the nerve going to the ear, and that these symptoms should improve with time. (AR 323.) Dr. Khosla recommended surgery for the instability at C6-7 (a posterior C6-7 laminectomy and lateral mass fixation). (AR 323.)

Dr. Khosla performed the surgery on January 14, 2013. (AR 332-33.) Plaintiff was advised to avoid lifting or repetitive motion above the shoulder level, and was prescribed oxycodone and valium. (AR 394.)

On January 25, 2013, he was seen by a nurse practitioner in Dr. Khosla's office for a follow up. (AR 326-27.) He appeared tearful, frustrated, and scattered with his thoughts. (AR 326.) His neck pain had improved, but he had some spasm to the trapezius muscles, and reported some depression because he was not progressing as he felt he should. (AR 326.) The CT scan of his head was normal. (AR 326.) X-rays were ordered, and he was instructed to follow up in four weeks. (AR 326.)

Plaintiff saw Dr. Vacek on February 8, 2013, and reported continued numbness in the leg and back, but it was improving. (AR 438.) He did not feel he could decrease his pain medications at that time, but his dizziness was better. (AR 4328.) He reported that he normally ambulated with a cane, but used a walker if he had dizziness. (AR 438.) He had decreased range-of-motion in his neck, and was ambulating with a walker that day. (AR 438.) His cervical spine was tender, associated with the recent surgery. (AR 438.) He was advised to continue on the oxycodone, gabapentin and diazepam, and to continue using the walker or cane as needed for dizziness, and hope for continued improvement with those symptoms. (AR 438-39.)

Cervical spine x-rays on February 22, 2013, showed no significant degenerative changes. (AR 403.)

///

10

1        Plaintiff saw Dr. Khosla again on February 25, 2013. (AR 328.) Again, he was tearful and

2    emotional, and reported that he was in significant pain in the mid-thoracic spine. (AR 328.) He said the

3    medications were not working. (AR 328.) Dr. Khosla noted that Plaintiff had been provided with a one-

4    month supply of pain pills by his primary physician, and ran out, which had been deemed a violation of

5    the pain contract. (AR 328.) He was advised to see his primary care doctor to discuss this issue.

6    (AR 328.) Dr. Khosla recommended evaluation of the thoracic spine pain with x-rays to make sure there

7    was no fracture worsening in the area. (AR 328.)

8        Plaintiff saw Dr. Vacek the next day regarding the chronic pain issues, and his medications.

9    (AR 437.) The record states that Plaintiff was in no acute distress, and was ambulating without difficulty.

10   (AR 437.) He was assessed with chronic pain, neck pain post cervical spine fracture and surgery.

11   (AR 437.) He was advised that to refill his pain medications he would have to undergo a urine test, but

12   as of the time the lab closed, he had not reported for the test, which Dr. Vacek considered a violation of

13   pain contract. (AR 437.)

14       A February 28, 2013 x-ray of the thoracic spine revealed mild degenerative changes. (AR 348.)

15   Plaintiff's wife called Dr. Khosla's office on April 1, 2013, asking about the x-rays, and reported that

16   Plaintiff was complaining of significant pain below the level of the cervical fusion, and had a noticeable

17   hunch. (AR 348.) The office called her back and told her the x-ray results were normal, with some mild

18   degenerative changes, and was advised Plaintiff was no longer taking any pain medications. (AR 330.)

19       Plaintiff saw M. Chad Banks, PA-C, on May 13, 2013, for medication refills. (AR 435.) There

20   was no tenderness on palpation of the spine, but Plaintiff reported that his spine was numb until the

21   junction of the thoracic and lumbar spine. (AR 435.) He described a shooting pain in the mid-thoracic

22   spine. (AR 435.) He was assessed with chronic pain secondary to neck surgery. (AR 435.) It was

23   explained that the narcotic medications could not be refilled due to non-compliance with the pain

24   contract, and he was referred back to the neurosurgeon for evaluation and treatment and follow up from

25   surgery. (AR 436.)

26       On June 6, 2013, Plaintiff's wife called Dr. Khosla's office and reported Plaintiff was slowly

27   improving. (AR 331.) Plaintiff was instructed to follow up with new x-rays. (AR 331.)

28       *///*

1    Plaintiff saw another nurse practitioner in Dr. Khosla's office on July 17, 2013. (AR 487.) He

2    reported ongoing neck pain and stiffness since the surgery, and was seen for further evaluation of pain

3    of the thoracic spine. (AR 487.) He reported having to ambulate in a stooped position as a result of the

4    pain, and the nurse practitioner noted pain on palpation in that region. (AR 487.) She indicated "palpable

5    muscle spasms at the mid thoracic spine off to [the] left hand side." (AR 487.) He was started on

6    Robaxin to see if it would help with the spasm. (AR 487.) A thoracic spine MRI was ordered to evaluate

7    the discs or nerve compression. (AR 487.)

8    August 22, 2013 x-rays of the cervical spine were normal, while the x-ray of the thoracic spine

9    revealed mild leftward curvature and mild degenerative disc disease, and an unremarkable lumbar spine.

10    (AR 467, 581.) An x-ray of the left shoulder revealed a lobulated density over the lateral scaphoid,

11    glenoid, and medial humeral head, and further evaluation was recommended. (AR 468.)

12    Richard  A. Cestkowski, D.O., saw Plaintiff for an orthopedic examination and evaluation on

13    August 22, 2013. (AR 474-481.) He also reviewed Plaintiff's medical records. Plaintiff complained of

14    constant pain in the cervical and thoracic spine, as well as intermittent pain in the lumbar spine.

15    (AR 475.) He reported that it was exacerbated with sitting or standing, bending, lifting and ambulation.

16    (AR 475.) On examination, Dr. Cestkowski noted that Plaintiff complained of pain when he palpated

17    the paracervical and trapezius area, and that there was a mild degree of spasm present with guarding to

18    deep palpation. (AR 475.) Plaintiff could not extend the thoracolumbar spine past thirty degrees flexion.

19    (AR 475.) Plaintiff ambulated to the exam room with a single-point cane, and had mild difficulty arising

20    from the examining table to the floor. (AR 476.) When asked to ambulate without a cane, Plaintiff did

21    so with a broad-based gait, and his spine flexed forward to thirty degrees, with both hands on his thighs.

22    (AR 476.) He was unable to heel or toe walk. (AR 476.)

23    Dr. Cestkowski stated that there was no objective evidence of cervical myelopathy/radiculopathy,

24    but there was thoracolumbar pain with a history of fractures and evidence of mild degenerative disc

25    disease of the thoracic spine. (AR 476.) There were abnormal findings in an x-ray of the left shoulder

26    with further evaluation recommended. (AR 477.) He also acknowledged headaches, which he stated

27    were most likely muscle tension, as well as anxiety and insomnia. (AR 477.)

28    ///

Dr. Cestkowski opined Plaintiff could lift/carry up to twenty pounds occasionally, and ten pounds frequently; he could stand/walk for six hours in an eight-hour workday; he could sit for up to six hours in an eight-hour workday; he needed to alternate between standing and sitting, but standard breaks would provide sufficient relief; he could occasionally climb ramps/stairs, balance, stoop, bend, kneel, crouch/squat, and crawl, but he could never climb ladders or scaffolds. (AR 478.) He opined Plaintiff was limited in reaching, and limited travel due to the amount of time required to sit; and also limited exposure to heights, moving machinery and vibration. (AR 479.) Dr. Cestkowski's explanation of these limitations was a statement that Plaintiff was in no acute distress despite a reported pain level of 8. (AR 479.)

A September 5, 2013 MRI of the thoracic spine showed mild degenerative disc changes in the mid-thoracic region, with minimal thoracic spondylotic changes at T5-6 and T8-9. (AR 489-90.)

Plaintiff saw Dr. Khosla for a follow up on September 9, 2013, and Plaintiff complained of continued significant pain in the neck and thoracic spine. (AR 488.) Plaintiff had some muscular pain in the paraspinal muscles in the lower cervicothoracic junction. (AR 488.) He was prescribed Tramadol and Flexeril, and was advised that if this did not get better with the medications he might need to have cervical and lumbar MRIs and x-rays. (AR 488.)

Plaintiff saw Dr. Khosla next on December 6, 2013, and brought his disability paperwork. (AR 499.) Dr. Khosla stated:

> At this point he has multiple complaints referable to neuropathic damage as well as nondermatomal pain patterns. He obviously has tangential thought process and flight of ideas in the way he constructs his sentences. He needs Tramadol and muscle relaxants and I will give him a refill on those. I have instructed him that I do not do long term pain management, but I have given him a few refills on these meds. He may need to find a primary care doctor to take over eventually on these. He will follow-up with me on a p.r.n. basis. I have given him the paperwork back on his disability with the limitations that I feel that he has, more from his head injury than from his spine injury, but the combination of the two seems to be giving him long lasting issues.

(AR 499.)

Dr. Khosla then filled out a form titled "Medical Opinion Re: Ability to Do Work-Related Activities (Physical)." (AR 501-503.) Dr. Khosla opined that Plaintiff could lift/carry ten pounds occasionally and frequently; stand/walk less than two hours in an eight-hour workday; sit less than two

hours in an eight-hour workday; he would need to walk around for twenty minutes at twenty minute intervals; he needed the opportunity to sit or stand at will; he would sometimes need to lie down at unpredictable intervals; he could occasionally twist, stoop, crouch, climb stairs and ladders; reaching, fingering, feeling, pushing and pulling were limited; and he would likely be absent more than three times a month. (AR 501-503.)

Plaintiff had a neurology consultation with Stephanie Smith, M.D., on November 18, 2014. He reported chronic parasthesias, numbness, burning/stabbing peripheral pain to the back and legs, to the point where he uses crutches. (AR 522.) She observed antalgic and limping gait, and that he used a cane for assistance. (AR 522.) She recommended a topical, compounded medication, as well as oxymorphone, counseled him regarding medical marijuana, and suggested physical therapy might be useful. (AR 523.)

He saw neurologist Darlene Mullon, M.D., on January 19, 2015. (AR 525-26.) He reported chronic pain in the neck, thoracic and lumbar spine, as well as pain in his legs and feet. (AR 525.) She noted that a June 18, 2014 MRI showed minimal degenerative changes, and an MRI of the lumbar spine showed minimal posterior disc bulge at L4-5 and L5-S1. (AR 525.) He was on multiple neuropathic pain medications, but reported none of them were helpful. (AR 525.) He also had chronic headaches. (AR 525.) She noted that he ambulated with a decreased stride and mildly wide base, and required a cane for support. (AR 526.) She stated that he would benefit from pain management through a pain clinic and would refer him. (AR 526.) She also referred him for an EMG/nerve conduction study to evaluate neuropathy and radiculopathy. (AR 526.)

Plaintiff saw Dr. Khosla on March 10, 2015, who noted that Plaintiff continued to ambulate stooped in pain in the mid-thoracic and low spine, and also complained of headaches and numbness to the left thigh. (AR 518.) Dr. Khosla stated Plaintiff was recently diagnosed with rheumatoid arthritis. (AR 518.) He was ambulating with a cane. (AR 518.) He had been referred to pain management, went to physical therapy, and received injections to the low back which had not helped. (AR 518.) On physical examination, Dr. Khosla again noted Plaintiff ambulated in a stooped manner with an antalgic gait, which was described as very abnormal. (AR 519-20.) He was advised to follow up after imaging was performed. (AR 520.)

Plaintiff was seen for a follow up with neurology on March 20, 2015. (AR 527-28.) He noted improvement in his headaches after being given Topamax after his last visit, but still complained of chronic neck, thoracic and low back pain, as well as pain in his feet and legs. (AR 527.) The peripheral neuropathy screen revealed slight elevation. (AR 527.) He was ambulating with a decreased stride and a mildly wide base, requiring a cane for support. (AR 528.) He was referred for pain management and to rheumatology, was scheduled for spine MRIs, and advised to follow up after the nerve conduction study. (AR 529.)

A March 25, 2015 x-ray of the lumbar spine showed alignment within normal limits, and minimal degenerative changes. (AR 516.) The x-ray of the cervical spine showed no significant degenerative changes. (AR 517.)

The EMG/nerve conduction study was performed by Timothy J. Louie, M.D., on April 16, 2015. (AR 565.) The study was essentially normal, but Dr. Louie cautioned that a diagnosis of lateral femoral cutaneous nerve impingement is mostly clinical. (AR 565.)

Plaintiff saw the neurologist again on May 1, 2015, who noted that the MRI of the cervical spine revealed a disc bulge at C4-5, mild central canal stenosis, and anterolisthesis with abutment of the cord at C6-7. (AR 531.) The MRI of the thoracic spine revealed a small right disc protrusion at T5-6, and a broad-based disc bulge at T8-9 without stenosis. (AR 531.) He was scheduled with pain management on May 19. (AR 531.) He again appeared with an antalgic gait. (AR 533.) The neurologist noted that his symptoms were suggestive of femoral neuropathy even though the test was normal. (AR 534.) He was advised to follow up with Dr. Khosla and pain management. (AR 534.)

May 26, 2015 notes from the neurologist indicate that Plaintiff had seen the neurosurgeon, who advised Plaintiff was "nonsurgical" at that point. (AR 535.) He had an epidural injection the prior week, and was on Topamax. (AR 535.) He was going to see pain management, get a trial of a neuropathy cream, as well as Lyrica and follow up. (AR 537.)

**b. The ALJ's Findings**

The ALJ assigned Dr. Cestkowski's opinions significant weight, stating that they were "consistent with other opinions contained within the case as well as with the medical record as a whole." (AR 26.) The only other opinion regarding Plaintiff's physical limitations (other than

Dr. Khosla's) was that of Nalini Tella, M.D., who only reviewed the records, and never examined Plaintiff. The ALJ assigned Dr. Tella's opinions substantial weight, providing a summary of Dr. Tella's conclusions, but no other explanation regarding the weight assigned to the opinion.

The ALJ stated the following concerning Dr. Khosla:

In December 2013, Deven Khosla, M.D. examined the claimant and provided a medical opinion on behalf of the claimant and his representative. Dr. Khosla's opinion is assigned little weight. Dr. Khosla examined the claimant and found him to have a tangential thought process and flight of ideas. He was found to require a sedentary exertion level and Dr. Khosla included additional limitations including limiting his ability to stand, walk and sit to two hours and his ability to twist, stoop, crouch, and climb stairs and ladders was restricted to occasionally. His reaching, fingering and pushing/pulling abilities were also restricted. These restrictions are found to not correspond with other medical opinions available and are based upon one examination at the request of the claimant's counsel. His opinion severely restricts the claimant's exertion level and does so far in excess of what other medical professionals found to be necessary.

(AR 26-27.)

### c. Dr. Khosla was Plaintiff's Treating Neurosurgeon

The court will first address whether Dr. Khosla was a treating physician. The regulations define a treating source as one who has provided the claimant with "medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with" the claimant. 20 C.F.R. § 404.1527(a)(2). Generally, this is the case when the claimant sees or has seen the provider "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id*. "We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)." *Id*. If the relationship is based solely on the need to obtain a disability report, the source will be considered a non-treating source. *Id*.

The Commissioner's statement that Plaintiff only saw Dr. Khosla at the hospital following the accident, and then for his surgery is belied by the record. Dr. Khosla was the consulting neurosurgeon concerning several spinal fractures at the hospital following Plaintiff's motor vehicle accident on November 21, 2012. (AR 377, 387.) Initially, the fractures were managed non-operatively, with an instruction for Plaintiff to follow up in two weeks. (AR 377, 387.) Another x-ray of the cervical spine

was performed on January 8, 2013 (AR 362), and Plaintiff saw Dr. Khosla again on January 10, 2013. (AR 323.) After reviewing the x-rays, Dr. Khosla recommended surgery, which was performed on January 14, 2013. (AR 332-33342-44.) Plaintiff was seen by the nurse practitioner in Dr. Khosla's office for a follow up on January 25, 2013. (AR 326-27.) He saw Dr. Khosla again on February 25, 2013, and complained of pain to the thoracic spine. (AR 328.) He saw another nurse practitioner in Dr. Khosla's office on July 17, 2013. (AR 487.) He followed up with Dr. Khosla next on September 9, 2013 (AR 488), and then again on December 6, 2013 (AR 499). It was at the December 6, 2013 appointment that Plaintiff presented Dr. Khosla with the disability paperwork, and Dr. Khosla provided his opinions. (AR 499, 500-503.) Thereafter, he saw Dr. Khosla on March 10, 2015. (AR 519-520.)

In the court's estimation, this would certainly qualify as a treating physician relationship.

In any event, whether Dr. Khosla was considered a treating or examining physician, faced with contradictory opinions, the ALJ was required to provide specific and legitimate reasons for rejecting his opinions that are supported by substantial evidence in the record. *Garrison*, 759 F.3d at 1012.

**d. The ALJ Improperly Rejected Dr. Khosla's Opinion as Being Given at the Behest of Counsel**

Preliminarily, the court is not persuaded by the Commissioner's argument that the ALJ appropriately rejected Dr. Khosla's opinion as being provided at the behest of counsel. The Commissioner relies on *Reddick v. Chater*. *Reddick* actually states that "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does *not* provide a legitimate basis for rejecting it." *Reddick v. Chater*, 157 F.3d 715, 726 (9th Cir. 1998) (emphasis added). *Reddick* noted cases where a doctor's opinion letter was properly rejected where "actual improprieties" had been found, where the letter varied from the treatment notes and was worded in an "apparent attempt to assist [the claimant] in obtaining social security benefits" and, where the opinion was unsupported by medical findings, personal observations or test reports. *Id.* (citing *Burkhart v. Bowen*, 856 F.2d 1335 (9th Cir. 1988); *Saelee v. Chater*, 94 F.3d 520 (9th Cir. 1996), *Lester v. Chater*, 81 F.3d 821 (9th Cir. 1995)). There is no evidence in the record of "actual improprieties," that the opinion was worded in an attempt to assist Plaintiff in obtaining benefits, or that it is completely unsupported by the objective medical evidence. Therefore, this was not a valid reason to discount

Dr. Khosla's opinion.

The only other basis provided for rejecting Dr. Khosla's opinions was that his opinions on Plaintiff's functional abilities were inconsistent with and far in excess of what the other medical professionals found to be necessary. That leaves the comparison of Dr. Khosla's opinion to the opinions of the other medical sources, which include the opinions of consultative examiner,
Dr. Cestkowski, and non-examining physician, Dr. Tella.

**e. The ALJ's Assignment of Significant and Substantial Weight to the Opinions of Dr. Cestkowski and Dr. Tella, respectively, and Little Weight to Dr. Khosla's Opinions is Not Supported by Substantial Evidence**

Again, the ALJ assigned Dr. Cestkowski's opinions significant weight, stating they were consistent with other opinions in the case, as well as with the medical record as a whole. (AR 26.) The only other opinion regarding Plaintiff's physical limitations (other than Dr. Khosla's) was that of Dr. Tella, who only reviewed the records, and never examined Plaintiff. Moreover, the ALJ gives no substantive explanation as to how Dr. Cestkowski's opinions are consistent with the record.

With respect to Dr. Khosla's opinions, the ALJ similarly omitted any real substantive discussion regarding why Dr. Cestkowski and Dr. Tella's opinions were given more weight. It is obvious that the conclusions are different from those offered by Dr. Cestkowski and Dr. Tella, but in order to give a treating physician's opinions less weight, the ALJ was required to do more than simply offer a conclusion about whose opinions were preferred. The ALJ was required to set forth her interpretations "and explain why they, rather than the doctor's, are correct." *Garrison*, 759 F.3d at 1012 (internal quotation marks and citation omitted). The ALJ failed to do so, and therefore erred.

**C. Plaintiff's Pain Testimony**

**1. Summary of Argument**

Plaintiff argues that the ALJ made no specific findings as to Plaintiff's credibility, and instead improperly disregarded Plaintiff's subjective pain testimony solely on the basis that it was not substantiated by objective medical evidence.

The Commissioner argues that the ALJ's assessment of Plaintiff's testimony was the culmination of all relevant evidence in the record. The Commissioner states that the ALJ relied on lack of objective

1
2
medical support, that opinion evidence and the treatment record reflected conservative and effective care,
and activities of daily living contradicted the subjective complaints of greater limitations.

3
**2. Legal Standard**

4
"[A] claimant's credibility becomes important at the stage where the ALJ is assessing residual
5
functional capacity, because the claimant's subjective statements may tell of greater limitations than can
6
medical evidence alone." *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001) (citing SSR 96-
7
7P)). Thus, a claimant's credibility is often crucial to a finding of disability. The ALJ is responsible for
8
determining credibility. *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007).

9
There is a two-step test for determining the extent to which a claimant's symptom testimony must
10
be credited:

11
> First, the ALJ must determine whether the claimant has presented objective medical
> evidence of an underlying impairment which could reasonably be expected to produce
12
> the pain or other symptoms alleged. In this analysis, the claimant is *not* required to show
> that her impairment could reasonably be expected to cause the severity of the symptom
13
> she has alleged; she need only show that it could reasonably have caused some degree
> of the symptom. Nor must a claimant produce objective medical evidence of the pain or
14
> fatigue itself, or the severity thereof.
15
> If the claimant satisfies the first step of this analysis, and there is no evidence of
> malingering, the ALJ can reject the claimant's testimony about the severity of her
16
> symptoms only by offering specific, clear and convincing reasons for doing so. This is
> not an easy requirement to meet: The clear and convincing standard is the most
17
> demanding required in Social Security cases.

18
*Garrison v. Colvin*, 759 F.3d 995, 1014-15 (9th Cir. 2014) (internal quotation marks and citations
19
omitted) (emphasis original).

20
An ALJ may consider various factors in assessing the credibility of the allegedly disabling
21
subjective symptoms, including: daily activities; the location, duration, frequency, and intensity of pain
22
or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects
23
of any medication taken to alleviate symptoms; treatment, other than medication, received for relief of
24
symptoms; any measures a claimant has used to relieve symptoms; and other factors concerning
25
functional limitations and restrictions due to symptoms. 20 C.F.R. § 404.1529(c), § 416.929(c). The ALJ
26
may also consider ordinary techniques of credibility evaluation, or an "unexplained or inadequately
27
explained failure to seek treatment or to follow a prescribed course of treatment." *Ghanim v. Colvin*, 763
28

19

1    F.3d 1154, 1163 (9th Cir. 2014) (quotation marks and citation omitted).

2        **3. Analysis**

3        Here, the ALJ summarized Plaintiff's statements, and found that the medically determinable

4    impairments could reasonably be expected to cause the alleged symptoms, but then stated that "the

5    claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are

6    not entirely credible for the reasons explained in this decision." (AR 23.) The ALJ then went on to

7    summarize the medical evidence in the record, along with the medical opinions, and assigned the

8    opinions weight. (AR 24-27.) In evaluating the medical opinions, the ALJ made no correlation with

9    Plaintiff's subjective pain statements that had been summarized earlier in the decision. Instead, the ALJ

10   finished this portion of the decision by stating:

        In sum, the above residual functional capacity assessment is supported by and is
        consistent with the objective medical evidence, the record as a whole and the opinions
        of Drs. Loring, Cestkowski, Roldan, Kresser, and Tella. Further, the reports and
        testimony regarding the claimant's activities of daily living, as opposed to his alleged
        limitations, are consistent with and supported by the record in its entirety, and therefore,
        support the residual functional capacity assessment found.

15   (AR 27.)

16       The Ninth Circuit has held that "providing a summary of medical evidence in support of a

17   residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding

18   the claimant's symptom testimony not credible." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir.

19   2015) (emphasis original). The ALJ must connect the testimony to particular parts of the record. Id. "To

20   ensure that our review of the ALJ's credibility determination is meaningful, and that the claimant's

21   testimony is not rejected arbitrarily, we require the ALJ to specify which testimony she finds not

22   credible, and then provide clear and convincing reasons, supported by evidence in the record, to support

23   that credibility determination." *Id*. at 493.

24       The ALJ here did exactly what the Ninth Circuit cautioned against in *Brown-Hunter*. The ALJ

25   made a conclusory statement that Plaintiff's statements were not credible without identifying the

26   statements she found not credible, and failed to include an explanation as to why they were not credible.

27   Therefore, the ALJ erred. Such error is not harmless. *Brown-Hunter*, 806 F.3d at 494-95.

28   ///

**D. Remand**

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 874 F.3d 1130, 1132 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). When an ALJ improperly rejects a claimant's subjective symptom testimony without providing legally sufficient reasons, "the reviewing court may grant a direct award of benefits when certain conditions are met." *Id*. (citing *Varney v. Sec'y of Health & Human Servs.,* 859 F.2d 1396, 1400-01 (9th Cir. 1988)). This is known as the "credit-as-true" analysis. *Id. (*citing *Garrison*, 759 F.3d at 1019). "First, we ask whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion." Id. (citing Garrison, 759 F.3d at 1020). The answer here is yes.

Second, the court must determine "'whether there are outstanding issues that must be resolved before a disability determination can be made, … and whether further administrative proceedings would be useful.'" *Id*. at 1133 (quoting *Treichler*, 775 F.3d at 1101). Third, if these first two conditions are satisfied, the discredited testimony is credited as true to then determine whether "on the record taken as a whole, there is no doubt as to disability." *Id*.

This analysis was "intended as a rare and prophylactic exception to the ordinary remand rule when there is no question that a finding of disability would be required if claimant's testimony were accepted as true." *Id*. Even if the third step is reached, and the claimant's testimony is credited, "it is within the court's discretion either to make a direct award of benefits or to remand for further proceedings." *Id*.

Here, the court finds further administrative proceedings would be useful to determine whether Dr. Khosla's opinions of more restrictive limitations are in fact supported by the objective medical evidence, with an analysis that is supported by substantive explanations and not just conclusory statements; whether Dr. Cestkowski's less restrictive limitations are in fact supported by the objective medical evidence, particularly given that all of the providers to examine him commented on Plaintiff's unsteady gait and use of a cane without properly discrediting Plaintiff in this regard and he still opined Plaintiff could stand/walk up to six hours in a workday; and, whether another independent physical evaluation would be useful, especially in light of the latest neurological findings in the record. Therefore,

the court exercises its discretion to recommend remand of this matter for further administrative proceedings.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING** Plaintiff's motion insofar as remand is requested, **DENYING** the Commissioner's cross-motion, and **REMANDING** this matter for further proceedings.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of the District Court's judgment.

DATED:  January 23, 2018.

_William G. Cobb_
_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE